2025 IL App (2d) 240658-U
No. 2-24-0658
Order filed November 17, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF JENNIFER DALZELL, n/k/a Jennifer Johnson, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Petitioner-Appellee, | ) ) ) | |
| and | ) ) | No. 15-DV-878 |
| STEVEN DALZELL, | ) ) ) | Honorable Robert J. Zalud, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

*Held*: Respondent failed to establish that petitioner willfully disobeyed the parties' dissolution judgment.

¶ 1    Respondent, Steven Dalzell, appeals the McHenry County circuit court's directed finding in favor of petitioner, Jennifer Dalzell, n/k/a Jennifer Johnson, thereby denying his contempt petitions. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     On October 9, 2015, petitioner filed her petition to dissolve her marriage with respondent. On November 16, 2016, the parties entered an agreed allocation judgment as to their four minor children: A.R., C.S., A.L., and C.T. The agreement was later incorporated into the parties' January 29, 2018, dissolution judgment. Pertinently, paragraph E of the judgment provides:

> "[Petitioner] and [Respondent] shall each contribute to all ordinary and extraordinary medical, dental, psychological, vision/optical, prescription, and orthodontic expenses for the minor children, that are not covered by insurance including, but not limited to copays and deductibles, with [Petitioner] to pay forty percent (40%) and [Respondent] to pay sixty percent (60%) of said expenses, until each minor child's emancipation. If one party advances payment for any of said expenses as set forth herein, the other party shall reimburse his/her portion of the expense to the paying party within thirty (30) days of receiving invoice and receipt/proof of payment. Both parties shall be responsible to notify the other within fourteen (14) days prior to incurring extraordinary medical, dental, or optical expenses on behalf of the minor children provided that advance notification shall not be required in cases of emergency where delay may imperil the health or safety of the child. Extraordinary medical, dental or optical expenses are defined as, expenses incurred for necessary, nonelective procedures required for the child's medical, dental or optical health and well-being. Failure of a party to provide notification prior to incurring extraordinary medical, dental or optical expenses on behalf of the minor child to the other party within fourteen (14) days, absent cases of emergency where delay may imperil the health or safety of the child, forfeits that part's right to reimbursement for said expense(s)."

¶ 4     On January 29, 2020, respondent moved to modify the dissolution judgment's provisions concerning child support, maintenance, and parenting time. Respondent argued that two of the

parties' children—C.S. and C.T.—had recently begun residing with him. Thus, respondent sought a modification of the judgment "to reflect the current parenting time arrangement." On June 4, 2020, the parties entered an agreed order resolving respondent's motion. It provided that "[t]he terms of the parenting agreement entered [previously were] terminated." Additionally, the parties' remaining minor children—C.S., A.L., and C.T.—would henceforth reside with respondent, who would be responsible for any "[d]ectionmaking [*sic*] as to matters of health care, extracurriculars, and education."

¶ 5　　On May 18, 2023, respondent first petitioned the court for a finding of indirect civil contempt, alleging that petitioner violated paragraph E of the dissolution judgment by failing to reimburse certain expenses incurred for C.T.'s transport and admission to two care facilities. Specifically, respondent described how, on February 16, 2023, C.T. had been admitted to Alexian Behavioral Health Hospital before being transferred "to a facility in Connecticut." C.T. "was [then] asked to leave the [Connecticut] facility" and needed to be transferred to a second facility. Respondent claimed that he had provided petitioner proper notice for the transfer and admission costs to the two facilities, and that by failing to reimburse him, she had willfully violated paragraph E of the dissolution judgment. Respondent sought reimbursement for petitioner's share of the expenses, attorney's fees and costs, and requested that petitioner show cause for "why she ought not be held in contempt of court for violating the Judgment for Dissolution of Marriage."

¶ 6　　On June 26, 2023, petitioner filed her pretrial memorandum, contending that the sought expenses were not recoverable under the dissolution judgment. She argued that nearly $12,000 in claimed transportation costs—incurred for taking C.T. to two out-of-state treatment centers—did not qualify as medical expenses under the judgment because they were not "medically necessary." Petitioner also questioned whether the treatment itself fell within the judgment's scope. She noted

that one of the facilities C.T. attended—Outback Therapy in Utah (Outback Utah)—offered "wilderness therapy," which involved teens engaged in "outdoor activities" led by a "field therapist." Another purported treatment center—the Turnbridge facility in Connecticut—offered "regular outdoor activities, cultural events, adventures, sports, fitness, and leisure activities" as part of its "comprehensive mental health and substance use treatment." According to petitioner, the facility further offered "such healing activities as downhill skiing, yoga, kayaking, enjoying a group hug," and "attending what appear[ed] to be a rock and roll concert." Petitioner argued that the amenities provided by these treatment centers were more akin to recreational services and were thus unrecoverable under paragraph E of the dissolution judgment, which squarely dealt with medical costs alone.

¶ 7    Alternatively, petitioner argued that, by failing to provide her with proper notice of the expenses, respondent forfeited any right to reimbursement. According to petitioner, respondent never gave her any detailed information or cost estimates concerning any of the relevant treatment centers. Instead, respondent had only notified petitioner of "the location of the facilities and his 'plans for moving forward.' "

¶ 8    Petitioner finally contended that respondent's contempt petition "fail[ed] procedurally," as respondent was unable to cite any clear language from any court order requiring reimbursement for the claimed expenses.

¶ 9    On July 31, 2023, respondent filed another motion to modify the parties' dissolution judgment. In this motion, respondent argued that, when the dissolution judgment had been initially entered, the parties had not fully contemplated how to allocate any costs resulting from their children's "special medical, mental, or emotional needs." Thus, respondent argued that the

judgment should be modified "to provide for contribution to [C.T.'s] extraordinary medical, mental, and educational needs."

¶ 10    On February 23, 2024, respondent filed his second contempt petition, now seeking reimbursement for costs connected to C.T.'s attendance at *three* different treatment centers: Turnbridge, Outback Utah, and KW Legacy Ranch, which was located in Nevada. On March 8, 2024, petitioner responded to the second contempt petition, generally denying any share in the expenses.

¶ 11    On May 22, 2024, Samantha Tramuta, a clinical director at Turnbridge, was deposed.

¶ 12    On August 6, 2024, respondent filed his third petition for indirect civil contempt, again seeking recovery petitioner's purported share of C.T.'s updated "medical expenses."

¶ 13    On September 9, 2024, the court commenced a trial over respondent's contempt petitions and motion to modify. Along with Tramuta's deposition, the evidence at trial established the following facts.

¶ 14    On February 16, 2023, C.T. was admitted to the hospital after experiencing active suicidal thoughts for the preceding two weeks. There, Dr. Mumtaz Raza, an attending psychiatrist at Alexian Brothers Behavioral Health Hospital, diagnosed him with "major depression, disruptive mood dysregulated disorder, ADHD, and opposition defiant disorder." Norbert Dudek, a former case manager for Alexian Brothers, testified that, as early as February 17, 2023, respondent expressed a desire to enroll C.T. into a residential treatment program. C.T., however, was "uneasy" about attending a long-term program. So, Dudek informed respondent about two shorter-term programs. However, respondent did not believe the shorter programs would be a good fit for C.T. By February 21, 2023, Raza's notes indicated that C.T. showed some improvement, in that he denied having any plans to harm himself.

¶ 15 Dudek believed that a DCFS investigator had prohibited Alexian Brothers from releasing C.T. to either parent "without their knowledge" due to "allegations against both parents." However, Dudek believed that he could essentially bypass this prohibition by discharging C.T. "via some professional transportation" company to another facility. Thus, on February 23, 2023, Dudek informed respondent that C.T. would not be able to go home "and need[ed] to go [directly] to a residential program." Raza denied making any recommendations as to whether the parties should utilize a professional company in transporting C.T. to Turnbridge.

¶ 16 On March 1, 2023, respondent informed Dudek that he had decided to enroll C.T. at the Turnbridge residential facility in Connecticut. That same day, respondent informed petitioner via the OurFamilyWizard messaging application of this development. Because he was told that he "definitely could not" transport C.T. to Turnbridge himself, respondent hired a professional company, Right Directions Crisis Intervention, to transport C.T., despite petitioner's offer to drive him there herself.

¶ 17 On March 7, 2023, Raza made a note in C.T.'s medical records suggesting that he be placed in a "partial hospitalization program" after his discharge from Alexian Brothers. "A partial hospitalization program is [a] program where the kids would go in the morning and then they would go home in the afternoon." C.T. had tried similar programs in the past without success. Raza indicated, however, that her note was actually "a typing error." She maintained that her recommendation had always been that C.T. attend a residential treatment program. Indeed, a March 8, 2023, note entered by Raza conversely included a recommendation that C.T. attend Turnbridge for "follow up care," although there were "residential treatment centers that [she was] aware of in the Chicagoland area." In any event, by March 7, 2023, C.T. seemed to be tolerating his "treatment well" and "did not need any restriction on his activities."

¶ 18    On March 8, 2023, C.T. was officially discharged. C.T.'s "discharge instructions" indicated that he was currently "stable" and could be discharged to his "[h]ome." The instructions further confirmed that C.T.'s suicidal ideations had ceased.

¶ 19    C.T. attended Turnbridge for approximately 30 days beginning in March 2023. In addition to therapeutic treatment, Turnbridge offered its male "clients" activities including a "ropes challenge course," "field games," and "lawn games." These activities were "purely recreational" and did not serve a therapeutic purpose. The facility's housing included a game room and a swimming pool, and clients were provided "chef-prepared meals and snacks throughout the day." Additionally, C.T. received "academic advising" while at Turnbridge. All these amenities were included in the daily rate for "residential daily service providing."

¶ 20    During his attendance, C.T. had "broken into a couple [of] locked areas" within the facility, "stole cleaning solution[,] and drank it." C.T. also was involved in a physical altercation with another client. Given his issues, on April 4, 2023, respondent asked petitioner whether she was "in agreement to have the transfer company take [C.T.]" to a new facility. On April 6, 2023, Tramuta wrote a letter to respondent indicating that C.T. could no longer attend Turnbridge. The letter included recommendations—but not "clinical directive[s]"—for C.T.'s "next treatment steps," specifically that he be "taken by a professional transportation company" to another facility that could better manage him, given C.T.'s "safety and elopement concerns." Tramuta recommended several programs to respondent: "two experiential wilderness therapy programs and one traditional residential." She thought an "intensive experiential therapeutic program" was appropriate because they were generally more willing to accept clients with histories similar to C.T.'s.

¶ 21    Eventually, respondent decided to transfer C.T. to another facility, Outback Utah, and informed petitioner of the development. He also told petitioner that "he would be using private transportation" for the transfer.

¶ 22    Trevor Allen, a former therapist at Outback Utah, described how Outback Utah utilized "wilderness therapy," in which "students" are taken "out into the desert," where they camp "for the duration of their stay." There, they are "monitored" and "supported" by "staff" and "are taught skills related to *** survival." On April 10, 2023, respondent sent petitioner invoices from Outback Utah, which included charges for "tuition" and, according to petitioner, appeared to be from a private school rather than a medical facility.

¶ 23    Allen conducted therapy with C.T. "[a]t least once a week" at Outback Utah. C.T. exhibited resistance while there, in that "he wasn't taking care of his body by drinking" water while out in the desert. As early as April 24, 2023, respondent expressed fear that C.T. may be removed from Outback Utah because of his behavior. Respondent contacted Karen Mabie, an expert "educational consultant as it pertains to the placement of adolescents and young adults that are addressing mental health issues," to find a new facility for C.T. In June 2023, Mabie recommended that a professional travel service take C.T. either to KW Legacy Ranch in Nevada or Ironwood, another facility in Maine. She believed these locations would not "give up on" C.T. Respondent paid $6000 for Mabie's recommendation. Allen, on the other hand, more generally suggested that C.T. would benefit from a non-specified residential center.

¶ 24    On June 9, 2023, respondent informed petitioner that "it's been decided that [C.T.] will [go] to KC Legacy Ranch for [t]herapuetic boarding school to continue with his treatment." On June 15, 2023, C.T. left Outback Utah for KC Legacy Ranch. C.T. was not discharged from

Outback Utah because of any "untoward" behavior, but rather, as a result of Outback Utah's immediate closure.

¶ 25    KW Legacy Ranch was described as "a residential facility for adolescent boys with mental health and substance abuse disorders" or "behavior problems." It was neither an "inpatient facility" nor "a medical facility," and its "students" did not "meet the standard insurance definition of being an immediate threat to self or others." The facility did not have a doctor on staff. However, Cody Stirling, a current therapist at KW Legacy Ranch, testified that it was licensed as a "mental hospital under the State of Nevada." Additionally, it provided schooling and participation in community service projects.

¶ 26    At KW Legacy Ranch, enrollees—which the facility referred to as "clients" or "students"—were subject to the facility's program, which was described as:

> "[A]n intense cognitive behavioral program written out for different stages of motivation of when anger management would be addressed, when communication skills would be addressed, when parent conflicts would be addressed, *et cetera* depending on their readiness for the different levels of intervention."

This program included "ranch duties[,]" although enrollees were paid for their work. Brian Bauduin, a previous, part-time "counselor" at KW Legacy Ranch, believed that "working as a ranch hand was a medically recognized therapy." In response to a question concerning what specifically made the facility's therapeutic services unique, Bauduin entered the following exchange with petitioner:

> "A. The environment.
>
> Q. Okay.
>
> A. The [milieu]."

Q. Okay. So when you say the environment and the [milieu], you mean actually being on a ranch in Nevada, right?

A. Scenic.

Q. Okay. Other than that, regarding counseling, could it have been done anywhere else?

A. I've not seen a clinical program tied into the level of—or stages of change quite as detailed as their program before. That doesn't mean they don't exist, but I've never seen such or know of any."

Eventually, Bauduin agreed that plenty of treatment providers "[a]ll over the world" offered mental health services to adolescent boys such as C.T.

¶ 27 On June 15, 2023, C.T. arrived at KW Legacy Ranch in a "very agitated," "very noncompliant" state. He continues to receive treatment for "some depression, suicidal ideation, [a] past history of self-harm, drug use," and "the potential for physical violence." He also receives "an education" while there. Stirling continues to treat [C.T.] "at least four times a week." C.T. was no longer a threat to himself but nonetheless had an "ongoing" need for "therapeutic services." KW Legacy Ranch continues to invoice respondent $13,000 each month for C.T.'s "tuition" at the facility. Respondent agreed that he had not given petitioner 14 days' notice of any expenses underlying his three contempt petitions, generally because he "didn't have 14 days['] notice to give."

¶ 28 At the close of respondent's case, petitioner moved for a directed finding. While arguing against the motion, respondent agreed that "[t]here is no doubt" that paragraph E was "ambiguous," but nonetheless asserted that, by not reimbursing respondent for the relevant

expenses, petitioner "still did not comply with the parties' judgment regardless of how it is read." Respondent continued:

"To the extent—to the argument that [petitioner] can't be found in contempt, if the Court finds that this is not a contumacious violation because of the ambiguity, I believe that the Court can still find [petitioner] is responsible for 40 percent of the expenses, and that it would be inequitable for the Court not to do so."

The court took the matter under advisement.

¶ 29    On October 1, 2024, the court granted petitioner's motion for a directed finding, agreeing with petitioner that paragraph E did not clearly require her to reimburse respondent for the claimed expenses. Thereafter, the court allowed the parties additional time to argue whether it could otherwise order petitioner to reimburse respondent for her share of C.T.'s expenses, despite the lack of a contempt finding. On October 4, 2025, after further argument from the parties, the court found that it lacked any authority to alternatively order petitioner to reimburse respondent and denied the contempt petitions in a written order. On January 24, 2025, the court entered an Illinois Supreme Court Rule 304(a) order finding no just reason to delay an appeal from its October 4, 2024, order denying the contempt petitions.

¶ 30    Respondent appeals.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, respondent argues that the trial court erred in finding paragraph E ambiguous, and that, "even assuming paragraph E of the parties' dissolution judgment is ambiguous," the court erred "by not enforcing the judgment based upon [respondent's] petitions and the evidence presented at trial." Additionally, respondent requests that we exercise our authority to enter an

order requiring petitioner to reimburse respondent for all of the relevant expenses. We address these contentions in turn.

¶ 33     "Generally, civil contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party." *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). Contempt occurring outside the presence of the trial court is classified as indirect contempt. *Id.* "The failure to pay child support under a court order or judgment is *prima facie* evidence of indirect, civil contempt." *In re Marriage of Steinberg*, 302 Ill.App.3d 845, 853. "To support a finding of contempt, the order must be 'so specific and clear as to be susceptible of only one interpretation.' " *Id.* (quoting *O'Leary v. Allphin*, 64 Ill.2d 500, 514 (1976)).

> "The burden initially falls on the petitioner to prove by a preponderance of the evidence that the alleged contemnor has violated a court order. [Citation.] The burden then shifts to the alleged contemnor to show that noncompliance with the court's order was not willful or contumacious and that he or she had a valid excuse for failure to follow the court order." *Charous*, 368 Ill. App. 3d at 107.

¶ 34     "In all cases tried without a jury, [a] defendant may, at the close of [the] plaintiff's case, move for a finding or judgment in his or her favor." 735 ILCS 5/2-1110 (West 2022). In ruling on a motion for a directed verdict, a trial court must first consider whether, as a matter of law, the plaintiff has set forth a *prima facie* case "by offering at least 'some evidence on every element essential to [the plaintiff's underlying] cause of action.' " *In re Estate of Coffman*, 2023 IL 128867, ¶¶ 51-52 (quoting *Kokinis v. Kotrich*, 81 Ill. 2d 151, 154 (1980)). "If the plaintiff fails to meet this burden, the court should grant the motion and enter judgment for the defendant." *Id.*, ¶ 52. Because this determination involves questions of law, we review such decisions *de novo*. *Id.*

¶ 35    Here, respondent argues that paragraph E of the parties' dissolution judgment plainly specified that petitioner must reimburse him for any of C.T.'s expenses that were not covered by insurance, no matter "what kind of expense [he] might incur—medical, dental, psychological, vision/optical, prescription, and orthodontic expenses."   Respondent also asserts that the paragraph's "notice and forfeiture clauses" clearly did not apply to "psychological" expenses that were "reasonable" and "necessary," such as those incurred here. Because the parties' dissolution judgment obviously required reimbursement, respondent argues that he made a *prima facie* showing of contempt and that, as a result, the trial court erred in granting petitioner's motion for a directed verdict.

¶ 36    We disagree. As a starting point, we must consider paragraph E, which forms the basis of the contempt petitions. Again, this paragraph provides that:

"[Petitioner] and [Respondent] shall each contribute to all ordinary and extraordinary medical, dental, psychological, vision/optical, prescription, and orthodontic expenses for the minor children, that are not covered by insurance including, but not limited to copays and deductibles, with [Petitioner] to pay forty percent (40%) and [Respondent] to pay sixty percent (60%) of said expenses, until each minor child's emancipation. If one party advances payment for any of said expenses as set forth herein, the other party shall reimburse his/her portion of the expense to the paying party within thirty (30) days of receiving invoice and receipt/proof of payment. Both parties shall be responsible to notify the other within fourteen (14) days prior to incurring extraordinary medical, dental, or optical expenses on behalf of the minor children provided that advance notification shall not be required in cases of emergency where delay may imperil the health or safety of the child. Extraordinary medical, dental or optical expenses are defined as, expenses incurred

for necessary, nonelective procedures required for the child's medical, dental or optical health and well-being. Failure of a party to provide notification prior to incurring extraordinary medical, dental or optical expenses on behalf of the minor child to the other party within fourteen (14) days, absent cases of emergency where delay may imperil the health or safety of the child, forfeits that part's right to reimbursement for said expense(s)."

¶ 37 Pertinently, the plain language of this paragraph dictates that, as a general rule, petitioner is responsible for 40% of any uncovered "medical, dental, psychological, vision/optical, prescription, and orthodontic expenses" incurred for the minor children, regardless if the expenses are "ordinary" or "extraordinary." Where one party has incurred "extraordinary medical, dental, or optical expenses" for one of the minor children, however, notice must be provided to the other parent within 14 days for there to be any right to reimbursement. Notably, the notice provision does not reference either ordinary or extraordinary psychological costs, suggesting that psychological expenses are not subject to the notice requirement. Even more, the notice provision does not reference any "ordinary" medical, dental, or optical expenses, further suggesting that notice is only required for certain "extraordinary" expenses. The paragraph defines extraordinary medical, dental or optical expenses as "expenses incurred for necessary, nonelective procedures required for the child's medical, dental or optical health and well-being." Psychological services are not mentioned in the definition. Ordinary expenses are also not defined in the paragraph whatsoever. Moreover, the paragraph makes no references to recreational, educational, or transportation costs.

¶ 38 We next consider whether the expenses fall within the paragraph's scope. From the record, it is undeniable that each of the relevant facilities—Turnbridge, Outback Utah, and KW Legacy Ranch—all provided some level of therapeutic services to C.T. The resulting costs from these

services seemingly qualify as psychological expenses under the first sentence of paragraph E. Thus, assuming they do qualify, they would be reimbursable regardless of notice.

¶ 39    However, the record makes clear that respondent's expenditures did not only contribute to C.T.'s psychological services. The invoices from Outback Utah and KW Legacy Ranch, for example, include charges for "tuition," and the record shows that C.T. received some form of education or schooling from at least two of the facilities. Several of the facilities referred to its enrollees as "students," further supporting this conclusion. Additionally, each location also provided recreation and other services as part of their enrollment, alongside any therapeutic services. These amenities included such things as a ropes course, field and lawn games, chef-prepared meals, swimming, a game room, camping, and participation in community service projects. Additionally, a large amount of the relevant expenses went towards his transportation between the various facilities. Again, no language in paragraph E clearly entitles respondent to any expenses incurred for C.T.'s recreation or education. Further, under the language of paragraph E, it is unclear whether transportation costs between these facilities would qualify as a covered psychological expense as well, especially when one considers the evidence that C.T. was "stable" following his discharge from Alexian Brothers.

¶ 40    In all, the resulting costs involving the three facilities—which themselves seem to be amalgamations of boarding schools, sleepaway camps, and counseling centers—do not clearly fall into the scope of paragraph E, which deals solely with pure "medical, dental, psychological, vision/optical, prescription, and orthodontic expenses for the minor children." While some therapeutic services were provided by the facilities, respondent fails to distinguish any potentially reimbursable psychological expenses from non-covered educational or recreational costs, making it impossible to determine what—if any—portion is reimbursable. Accordingly, because C.T.'s

expenses from the facilities do not clearly fall within the scope of paragraph E, we find that it did not clearly obligate petitioner to reimburse respondent. For this reason, the trial court did not err in granting petitioner's motion for a directed verdict.

¶ 41    Respondent alternatively argues that the trial court should have ordered petitioner to reimburse him "even if [it] believed [petitioner's] noncompliance did not constitute contempt." He notes that, in each of his contempt petitions' prayers for relief, he requested a reimbursement order in addition to a contempt finding. On this basis, he contends the court had the authority to enforce the judgment by ordering petitioner to reimburse him, regardless of whether contempt was warranted. Respondent also maintains that our authority under Illinois Supreme Court Rule 366(a)(5) similarly permits us to order reimbursement for the claimed expenses, including attorneys' fees, and requests us to exercise that authority.

¶ 42    Respondent's "alternative argument" puts the cart before the horse. Rather than identifying any alternative provisions in the parties' dissolution judgment that entitle him to relief, respondent focuses solely on whether we—or the trial court—have the authority to order reimbursement. Yet, the question of authority presupposes a right to relief, and here, the trial court properly rejected respondent's sole argument that paragraph E clearly required petitioner to reimburse him for her 40% share of all the claimed expenses. Both below and on appeal, respondent has pointed to no other provisions in the judgment supporting his full claim for reimbursement. Given respondent's failure to establish—or even argue—any other avenue for relief, we find that the trial court did not err in declining to order reimbursement and decline respondent's request to enter such an order ourselves.

¶ 43                           III. CONCLUSION

¶ 44    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 45 Affirmed.